UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CORTEZ MARTIN,

    Plaintiff,

v.                                             CASE NO: 8:04-cv-845-T-26TGW

AT&T SHORT TERM DISABILITY PLAN
FOR MANAGEMENT EMPLOYEES,

    Defendant.
_____/

**O R D E R**

Before the Court are Plaintiff's Motion for Summary Judgment (Dkt. 16), Defendant's Statement of Disputed Facts in Opposition (Dkt. 29), Defendant's Memorandum in Opposition (Dkt. 30), Defendant's Motion for Summary Judgment and Final Judgment (Dkt. 21), Defendant's Statement of Undisputed Facts (Dkt. 26), and Plaintiff's Response. (Dkt. 28). After careful consideration of the arguments of counsel and the entire file, the Court concludes that Defendant's Motion should be granted, and Plaintiff's denied.

**Relevant Background**

Plaintiff Cortez Martin worked for AT&T Corp. (AT&T) for over three years before he filed a claim for disability benefits under the Short Term Disability Plan administered by AT&T's third party claims administrator, MetLife. Plaintiff had been

diagnosed with multiple sclerosis in August 2000, and on August 1, 2002, he was unable to come to work as a result of his condition. (Dkt. 22 at 30). He filed his first claim for short-term disability benefits on August 1, 2002. MetLife "certified" Plaintiff as disabled from August 8, 2002, through November 6, 2002.

After that 90-day period, however, Plaintiff's disability was "non-certified" by MetLife for the reasons that the medical documentation submitted and the physical activity engaged in by Plaintiff did not support his claim for disability. Plaintiff followed the appropriate procedures to appeal MetLife's decision. After MetLife affirmed its denial, it forwarded the appeal to the Benefit Claim and Appeal Committee of AT&T (BCAC). BCAC upheld MetLife's denial of benefits on March 18, 2003. During the claims process, Plaintiff was off work from August 1, 2002, until February 3, 2003.

While the first claim was on appeal with BCAC, on March 4, 2003, AT&T notified Plaintiff that he had been identified as "at-risk for involuntary termination" as part of AT&T's Force Management Program (FMP). AT&T offered a severance package which provided the employee with sixty days to secure another position within AT&T or accept the severance pay-out. As part of the severance pay-out package, or AT&T Separation Plan (ASP), the employee was required to sign a Termination Agreement and Release (Release). Plaintiff's scheduled off-payroll date was May 2, 2003, which was the deadline for returning the signed Release and other documents to insure receiving the full allowable amount of severance pay. Plaintiff's supervisor, David DeVinney, avers that

he told Plaintiff on March 4, 2003, to read through all the documents before signing and to have the Release reviewed by a lawyer before signing. (Dkt. 17 at para. 8 & 9).

Beginning April 14, 2003, however, Plaintiff again stopped coming to work due to his physical condition, and filed another claim for disability benefits, which MetLife treated as a relapse claim, or one related to the prior claim.[1]  MetLife denied this second claim on May 7, 2003.  Plaintiff appealed, MetLife affirmed, and BCAC affirmed MetLife's denial on July 10, 2003.  The BCAC concluded that "the medical documentation presented did not show any level of severity or objective findings that would have disabled you from performing your sedentary job duties." (Dkt. 2, Exh. A).

On May 2, 2003, the date of Plaintiff's scheduled off-payroll date and just five days before the denial of Plaintiff's second claim, Mr. DeVinney conducted the exit procedures whereby Plaintiff removed his possessions from his office and AT&T took back property belonging to the company.  Plaintiff signed the Release on May 8, 2003,[2] the day after MetLife denied his second request for disability and before Plaintiff

---

[1] Plaintiff testified at his deposition that each time he filed for disability benefits, the disability was based on the "same condition," which was his multiple sclerosis. (Dkt. 22 at 72-75).

[2] The ASP required that the signed documents be sent to a third party vendor named Convergys.  Because Plaintiff did not postmark the signed documents until May 8, 2003, as opposed to May 2, 2003, the amount of his lump sum severance payment was reduced by twenty (20) percent. (Dkt. 20 at para.3).

implemented the appeal of the second denial of benefits.[3] The Release provides in pertinent part in paragraph 3:

> Subject to paragraph 5 herein, on behalf of myself, my heirs, executors, administrators, successors and assigns, I hereby unconditionally release and discharge the Company, the various Company benefit committees, trustees, plans and trusts, and their successors, assigns, affiliates, shareholders, directors, officers, representatives, agents and employees (collectively "Releasees" and individually the "Releasee") from any and all claims (including claims for attorneys' fees and costs), charges, actions, causes of action, demands, damages, and liabilities of any kind or character, in law or in equity, suspected or unsuspected, past or present, that I ever had, may now have, or may later assert against any Releasee, arising out of or related to my employment or termination of employment with the Company. To the fullest extent permitted by law, this Termination Agreement and Release includes, but is not limited to: (a) claims arising under . . . ERISA . . .

(Dkt. 9, Exh. A at page 4). In paragraph 4 of the Release, Plaintiff covenanted and agreed as follows:

> not to bring any action, suit or administrative proceeding contesting the validity of this Termination Agreement and Release or attempting to negate, modify or reform it, nor to sue the Company or any Releasee for any reason, . . . If I breach either Paragraph 3 or 4 hereof, . . . I shall: (I) promptly return to the Participating Company all consideration received hereunder (less one hundred dollars ($100.00), and (ii) pay any Releasee all of their actual attorneys' fees and costs incurred in each such action, . . .

---

[3] Plaintiff testified at his deposition that he probably could have asked his counsel about the Release before he signed it on May 8, 2003, but he did not "think to ask him anything" about the Release. (Dkt. 22 at 90-91).

(Dkt. 9, Exh. A at page 5).

Page 9 of the Release contains a Notice of Option and Election, which Plaintiff also signed on May 8, 2003, thereby electing the option. The Notice provides as follows:

> IMPORTANT NOTICE — MANAGEMENT EMPLOYEES ELIGIBLE TO RECEIVE BENEFITS PURSUANT TO THE SHORT TERM DISABILITY BENEFIT PLAN (STDBP BENEFITS) ON THEIR SCHEDULED OFF-PAYROLL DATE
>
> If you are eligible to receive STDBP Benefits on your Scheduled Off-Payroll Date you may be able to elect to waive and give up your right to continue receiving STDBP Benefits in order to receive all applicable ASP Benefits pursuant to the terms of the ASP in the standard timeframe. . . .

(Dkt. 9, Exh. A at page 9). The Election provides in full:

> OPTION Waiver of continued STDBP and receipt in the standard timeframe of applicable ASP benefits for which you are otherwise eligible
>
> If you elect this option, you are withdrawing and waiving, to the fullest extent allowed by law, any eligibility or entitlement you would otherwise have pursuant to the terms of the STDBP for benefits for the period after your Scheduled Off-Payroll Date and your STDBP Benefits will cease as of your Scheduled Off-Payroll Date. You are also waiving and giving up any right, claim or entitlement to any future disability benefits, including long-term disability benefits and associated fringe benefit programs of any kind to which you might otherwise have been entitled. You further understand and agree that, pursuant to your voluntary election of this Option and, to the extent permitted by law, the Company may pursue discontinuance of any workers' compensation benefits to which you may otherwise be entitled. Your employment will terminate on your Scheduled Off-Payroll Date.

(Dkt. 9, Exh. A at page 9).

The Release is not a part of the administrative record of the denial of welfare benefits. The denial of short term disability benefits is based on reasons other than the Release. Defendant, the STD Plan, attaches a copy of the ASP with the signed Release to its counterclaim for breach of the Release. The STD Plan alleges that Plaintiff breached the Release by suing the STD Plan for a claim "arising out of or related to" Plaintiff's employment with AT&T, specifically a claim arising under ERISA. (Dkt. 9). The STD Plan seeks attorneys' fees and costs pursuant to the covenant not to sue found in paragraph 4 of the Release.

Plaintiff denies the allegations of the counterclaim, responding that the ERISA claim at issue "does not arise out of nor is it related to Plaintiff's employment or termination of employment with AT&T." Plaintiff raises affirmative defenses including (1) the STD Plan's waiver of any counterclaim or defense based on the Release, for failure to make it a part of the administrative record and (2) the lack of consideration for the release of rights to short term disability benefits. (Dkt. 14).

**The Release**

Plaintiff argues that first, the Release does not cover the present claim and second, the STD Plan has waived its right to assert the Release as a defense to this ERISA action because it was not a part of or referenced in the administrative claim file. If the Release applies to this claim and the defense has not been waived, then the Court need not determine whether the short term disability benefits were erroneously denied.

*Scope of Release*

In this action brought pursuant to ERISA, "[f]ederal common law controls the interpretation of a release of federal claims." Fulgence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209 (5th Cir. 1981).[4] "To determine the scope of a release, [the Court must] look to the parties' intent as expressed in the contract." Solitron Devices, Inc. v. Honeywell, Inc., 842 F.2d 274, 277 (11th Cir. 1988).

According to the plain language of the Release, it applies to this claim for the wrongful denial of welfare benefits under the plan. The critical language contained in paragraph 3 of the Release and the Option and Exception found on page 9, makes it clear that Plaintiff intended to absolve the STD Plan for all conduct that occurred prior to the date of the Release, which was May 8, 2003. In paragraph 3, Plaintiff unequivocally releases all "Company benefit committees" and "plans" from "any and all claims" that are "past or present, that I ever had, may now have, or may later assert" that arises out of or is related to Plaintiff's employment or termination. Lest there be any confusion, Paragraph 3 then specifically includes in the released claims all "claims arising under ERISA."[5]

The Option and Exception by their own terms apply to all management employees who "are eligible to receive STDBP Benefits on your Scheduled Off-Payroll Date." Those employees can "elect to waive and give up [their rights] to continue receiving

---

[4] This Fifth Circuit case was decided after October 1, 1981, and is not binding precedent in the Eleventh Circuit according to Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

[5] See Chaplin v. Nationscredit Corp., 307 F.3d 368, 372-73 (5th Cir. 2002) (holding that even a general release can bar claims under ERISA without a specific reference to ERISA claims).

STDBP Benefits in order to receive all applicable ASP Benefits." The Exception further clarifies that signing will result in any present STDBP Benefits ceasing on the scheduled off-payroll date, which in this case was May 2, 2003.

Absent any legal authority prohibiting the general, and in this case the specific, release of ERISA claims, particularly in the context of a severance pay-out, Plaintiff has forever released any rights to short-term disability benefits he may have had before May 8, 2003, the date he signed the Release. Plaintiff testified at deposition that he read the documents and that he was at least given a letter telling him to seek legal advice before signing the ASP documents. He does not recall seeking legal advice regarding the ASP and the Release. Both the claims for the off-work incidents of August 2002 and April 2003 were released as of May 8, 2003, regardless of whether he had already filed for the disability benefits or whether the benefits had already been denied before, during, or after the appeals process either within AT&T or the courts.

*Waiver*

Courts have held that an individual can waive his or her right to bring an ERISA claim by signing a general release. See Walker v. Asea Brown Boveri, Inc., 214 F.R.D. 58, 66 (D. Conn. 2003) (citing cases from various circuit courts of appeals). While independent research did not reveal a case on point in the Eleventh Circuit, the STD Plan cites Smart v. Gillette Co. Long-Term Disability Plan, 887 F.Supp. 383, 387 (D. Mass.), aff'd, 70 F.3d 173 (1st Cir. 1995), in support of its position that it, as opposed to Plaintiff, has not waived the defense of the Release. In Smart, the plan administrator of an ERISA

plan failed to cite a release as the reason for the denial of benefits.  The Court found that "ERISA requires only that the Plan notify a plaintiff of the reasons, *under the terms of the Plan* for its denial."  Id. at 387 (citing 29 C.F.R. § 2560.503-1(f)).   Because the Release was not a term of the Plan, it did not need to be cited as a reason for the denial of benefits.  Consequently, the STD Plan did not waive the defense of the Release to Plaintiffs' claim by failing to make it a part of the administrative file or by failing to list it as a reason for the denial of benefits.[6]

### Attorneys' Fees on the Counterclaim

Paragraph 4 of the Release contains a covenant not to sue the STD Plan to contest the validity of the Release.  Plaintiff's action seeks a determination of whether his welfare benefits were correctly denied, not whether the Release is valid.  To the extent the Release forbids Plaintiff from suing the STD Plan "for any reason," the Court finds that covenant overreaching.  The Release does not provide for attorneys' fees to be recovered by the STD Plan under the facts of this case, and therefore, no attorneys' fees will be awarded.

Because the Release and Exception foreclosed any right to receive past or future short term or long term disability benefits, it is wholly unnecessary to make any findings

---

[6] With respect to any concerns regarding consideration, it is clear that in exchange for signing the Release, Plaintiff received $ 6,016.00  as severance pay. (Dkt. 20 at para. 3).

or rulings on the merits of the denial of benefits claim. It is therefore **ORDERED AND ADJUDGED** as follows:

(1) Plaintiff's Motion for Summary Judgment (Dkt. 16) is **DENIED**.

(2) Defendant's Motion for Summary Judgment and Final Judgment (Dkt. 21) is **GRANTED**. Defendant's request for attorneys' fees is **DENIED**.

(3) The Clerk is directed to entered Final Summary Judgment in favor of Defendant on Plaintiff's Complaint and in favor of Defendant on Defendant's Counterclaim.

(4) The Clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, on April 27, 2005.

s/
**RICHARD A. LAZZARA
UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record